# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | Case No.: 2:22-cr-00267-JAD-EJY |
| Plaintiff | |
| v. | **Order Overruling Objections, Adopting Reports and Recommendations, and Denying Motions to Dismiss** |
| Dajuan Lamar Gamble, | [ECF Nos. 27, 28, 34, 35] |
| Defendant | |

Dajuan Gamble is charged with illegally possessing a rifle and a handgun and now moves to dismiss his indictment. He joins a chorus of defendants nationwide challenging the constitutionality of his charging statute, 18 U.S.C. § 992(g)(1), after the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* established a new test to analyze the constitutionality of firearm regulations. He also moves to dismiss the rifle-related portions of his indictment based on the government's failure to collect DNA from that firearm before sending it out for other testing, which precluded the opportunity for DNA testing. The government opposes both motions, asserting that individuals with felony convictions are not protected under the Second Amendment and the government did not act in bad faith when it failed to DNA test the rifle. The magistrate judge recommends that I deny both motions, and after a de novo review, I do.[1]

## Background

In September 2022, Gamble was outside the Economy Motel in downtown Las Vegas when he exchanged gunfire with an unknown passenger inside a van.[2] The motel's security

---

[1] I find that these motions are suitable for disposition without oral argument. *See* L.R. 78-1.

[2] ECF No. 1 at 3.

system recorded video of the incident, and Las Vegas Metropolitan Police Department (Metro) officers recognized Gamble on the recordings.[3]  The security video shows Gamble firing a handgun at the van, entering a motel room, and leaving the same motel room carrying a black bag.[4]  Officers received an anonymous tip that Gamble hid the handgun in the boiler room of the motel.[5]  With the manager's permission, officers searched the boiler room and found the handgun partially hidden underneath a black bag.[6]  Officers noted that the black bag appeared similar to the one that Gamble carried in the security video, but there was no video footage of Gamble accessing the boiler room.[7]  Officers obtained a warrant to search the bag and discovered a rifle inside it.[8]  Gamble, a previously convicted felon, was indicted on one count of being a felon in possession of a firearm under 18 § U.S.C. § 922(g)(1) and 924(a)(2).[9]

The handgun and its magazine were sent to Metro's laboratory for DNA testing.[10]  But the rifle was missing a component part, so it was shipped to a testing facility in Maryland to determine whether it qualified as a firearm under the statute.[11]  In accordance with Metro's policy, the rifle could no longer be tested for DNA evidence after it left Metro's laboratory.[12]

---

[3] *Id.* at 4.

[4] *Id.* at 4–5.

[5] *Id.* at 4.

[6] *Id.* at 4–5.

[7] *Id.* at 5.

[8] *Id.*

[9] ECF No. 14.

[10] ECF No. 1 at 6.

[11] ECF No. 31 at 7.

[12] *Id.*

The black bag was later submitted for DNA testing in response to Gamble's motion to dismiss, but the results were inconclusive.[13]

Gamble brings two motions to dismiss. In the first one, he contends that his charging statute violates his Second Amendment right because the Supreme Court's recent decision in *Bruen* abrogated prior Ninth Circuit Court of Appeals' jurisprudence that upheld § 922(g)(1) as constitutional.[14] In his second motion, he argues that his due-process rights were violated when Metro destroyed exculpatory DNA evidence on the rifle.[15] Gamble alternatively requests an adverse-inference instruction at trial because the lost DNA evidence prejudices his defense.[16] The government responds, arguing that individuals with felony convictions are not protected under the Second Amendment and § 922(g)(1) satisfies *Bruen*'s test because the statute is consistent with longstanding tradition.[17] It also avers that it did not act in bad faith when it sent the rifle to Maryland because the exculpatory value of DNA evidence on the rifle is not apparent.[18]

In two separate reports and recommendations, the magistrate judge recommends that I deny both motions because the Ninth Circuit's decision in *United States v. Vongxay*—the case that deemed § 922(g)(1) constitutionally sound—is still controlling law under *Bruen*,[19] and the facts of this case do not support a finding that DNA evidence on the rifle is exculpatory.[20] She

---

[13] ECF No. 31 at 11; ECF No. 48-1 at 2.

[14] ECF No. 27 at 2.

[15] ECF No. 28 at 4.

[16] *Id.* at 7.

[17] ECF No. 30 at 9, 14.

[18] ECF No. 31 at 11.

[19] ECF No. 34 at 5.

[20] ECF No. 35 at 6.

1   also recommends that I deny Gamble's request for an adverse-inference instruction at trial

2   because the government's conduct did not prejudice him.[21]  Gamble objects to both

3   recommendations, arguing that *Vongxay* does not pass *Bruen*'s newly minted historical-tradition

4   test,[22] Metro acted in bad faith because it knew the exculpatory value of the lost DNA evidence,

5   and there is no comparable evidence for Gamble to rely on.[23]  But if the case continues to trial,

6   he asserts that an adverse-inference instruction is warranted because he was prejudiced by the

7   loss of any DNA evidence on the rifle.[24]

8   **Discussion**

9   A district court reviews objections to a magistrate judge's proposed findings and

10   recommendations *de novo*.[25]  "The district judge may accept, reject, or modify the

11   recommendation, receive further evidence, or resubmit the matter to the magistrate judge with

12   instructions."[26]  The standard of review applied to the unobjected-to portions of the report and

13   recommendation is left to the district judge's discretion.[27]  Local Rule IB 3-2(b) requires *de novo*

14   consideration only of specific objections.[28]

---

18   [21] *Id*. at 8.

  [22] ECF No. 38 at 2.

19   [23] ECF No. 39 at 3–4.

20   [24] *Id*. at 4.

21   [25] Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(B); Local Rule IB 3-2(b) (requiring a district judge to review de novo only the portions of a report and recommendation addressing a case-dispositive issue that a party objects to).

22   [26] *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121–22 (9th Cir. 2003).

23   [27] *Id*.

  [28] *See* Nevada L.R. IB 3-2(b) (requiring *de novo* consideration of specific objections only).

**A.   § 992(g)(1) satisfies the new test in *Bruen*, and Gamble's prosecution under that statute does not violate the Second Amendment.**

Gamble is not the first defendant to challenge the constitutionality of § 992(g)(1)—the statute criminalizing firearm possession by individuals with felony convictions—after the Supreme Court's decision in *Bruen*.[29]  *Bruen* established a new test for courts to apply when analyzing Second Amendment challenges.  Many courts are now grappling with the legal questions left in *Bruen*'s wake.

The Supreme Court's pre-*Bruen* decisions established a two-step approach to analyze Second Amendment challenges.[30]  Under *D.C. v. Heller* and *McDonald v. City of Chicago*, a court asked (1) whether the challenged regulation fell within the scope of the Second Amendment and, if so, (2) what level of scrutiny was required to analyze that regulation.[31]  But the *Bruen* Court found this test to contain "one step too many."[32]  Although a court must now stop after step one, it must consider two distinct analytical questions there: whether "the Second Amendment's plain text covers an individual's conduct" and, if so, whether the regulation "is consistent with the nation's historical tradition of firearm regulation."[33]  The first question requires "a textual analysis focused on the normal and ordinary meaning of the Second Amendment's language."[34]  The second demands a historical assessment in which a court looks

---

[29] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

[30] *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

[31] *Bruen*, 142 S. Ct. at 2126.

[32] *Id*. at 2127.

[33] *Id*. at 2126 (cleaned up).

[34] *Id*. at 2127 (quoting *Heller*, 554 U.S at 576–577, 578).

to the historical record to determine how the Second Amendment was interpreted around the time of ratification up through the 19th century.[35]

### 1. *Bruen did not abrogate Vongxay.*

Gamble argues in his motion to dismiss that *Bruen*'s new test abrogated all prior Ninth Circuit Second Amendment decisions—including *Vongxay*,[36] a decision that upheld the constitutionality of § 922(g)(1).[37]  In her report and recommendation, the magistrate judge found that *Vongxay* was not abrogated by *Bruen*; rather, *Vongxay* is consistent with all three Supreme Court holdings in *Heller*, *McDonald*, and *Bruen*.[38]  She explained that *Vongxay* performed the textual and historical-tradition analysis required by the new one-step test, which confirmed § 992(g)(1)'s constitutionality.[39]

Gamble objects to the magistrate judge's finding, arguing that *Vongxay* is not controlling law.[40]  He theorizes that the Ninth Circuit's recent decision in *Teter v. Lopez*[41] demonstrates this circuit's intention to abrogate its earlier Second Amendment jurisprudence.[42]  Gamble explains that the *Teter* court found that two Ninth Circuit cases were abrogated by *Bruen*—*United States v. Chovan*, which challenged the constitutionality of a ban on domestic-violence misdemeanants' firearm possession;[43] and *Fyock v. Sunnyvale*, which challenged city ordinances restricting large-

---

[35] *Id*. (citing *D.C. v. Heller*, 554 U.S. at 605).

[36] *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010).

[37] ECF No. 27 at 4.

[38] ECF No. 35 at 5–7.

[39] *Id*. at 6–7.

[40] ECF No. 38 at 2.

[41] *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023).

[42] ECF No. 38 at 2–3.

[43] *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013), *abrogated by Bruen*, 142 S. Ct. 2111.

capacity magazines[44]—the court is poised to abrogate other Second Amendment decisions.[45] But the *Chovan* and *Fyock* courts could not or did not establish a longstanding historical tradition that would justify the firearm prohibitions they were evaluating.[46]  And because *Bruen* requires a textual and historical-tradition test, it follows that these two cases would be abrogated by *Bruen*. So *Teter* at most signals the Ninth Circuit's intention to abrogate Second Amendment precedent that can't pass *Bruen*'s textual and historical-tradition test.

The magistrate judge found that *Vongxay* does pass that test.  She reasoned that "the plain text of the Second Amendment does not reach protection of a felon's firearm possession," and prohibiting gun possession by felons "is consistent with the Nation's historical regulations of firearms."[47]  Gamble objects to that finding.  He argues that the *Vongxay* court "vacillated on the underlying historical question," which signifies its indecision on the matter.[48]  He also contends that *Vongxay*'s historical analysis is too thin to satisfy the new *Bruen* test, for *Bruen* requires a "firm historical tradition of distinctly similar gun regulations."[49]

Gamble overstates the similarity that *Bruen* demands.  The Court in *Bruen* recognized that, although a court should not uphold every modern law that has a remote historical counterpart, it is also not necessary that the government find a "historical *twin*" to a modern-day

---

[44] *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated by Bruen*, 142 S. Ct. 2111.

[45] ECF No. 38 at 2–3 (citing *Teter*, 76 F.4th at 947).

[46] *Teter*, 76 F.4th at 947, 950.

[47] ECF No. 34 at 6.

[48] ECF No. 38 at 5.

[49] *Id*.

law.[50]  "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[51]

The *Vongxay* court did examine the text of the Second Amendment and the historical tradition of restricting felons' gun rights.[52]  The court found that "denying felons the right to bear arms is consistent with the explicit purpose of the Second Amendment."[53]  It also identified analogous historical regulations that excluded felons from militias and the right to bear arms.[54]  Because the *Vongxay* court performed a historical-tradition analysis and concluded that history supports gun-possession limits on felons, I find that *Vongxay* is consistent with *Bruen* and remains controlling law.

### 2.   § 992(g)(1) satisfies __*Bruen*'s__ new test and remains constitutional.

Even if *Vongxay*'s analysis is too thin to render it controlling law post *Bruen*, its conclusion that § 992(g)(1) passes constitutional muster remains sound under the new test. Gamble objects to the magistrate judge's finding that the statute satisfies the first part of the *Bruen* test.[55]  He contends that the Second Amendment protects "the right of the people to keep and bear [a]rms," and individuals with felony convictions are still included in "the people" the founders intended to protect.[56]  The magistrate judge emphasized the Supreme Court's use of the phrase "law-abiding citizen" in *Heller*, *McDonald*, and *Bruen* and opined that it signified a

---

[50] *Bruen*, 142 S. Ct. at 2133 (original emphasis).

[51] *Id*.

[52] *Vongxay*, 594 F.3d at 1117–18 (cleaned up).

[53] *Id*. at 1117.

[54] *Id*. at 1117–18.

[55] ECF No 38 at 4–5.

[56] ECF No. 27 at 6.

1 limitation on *Bruen*'s holding and the Second Amendment more broadly.[57]  Gamble objects that
2 "law-abiding citizen" is just dicta in *Heller*.[58]

3        The High Court's statement in *Heller* that "nothing in our opinion should be taken to cast
4 doubt on longstanding prohibitions on the possession of firearms by felons" was more than mere
5 dicta as it was incorporated into the Court's analysis of "the historical understanding of the scope
6 of the right" and its "limitations."[59]  Justice Kavanaugh's concurrence in *Bruen* also emphasized
7 that the "Second Amendment allows a variety of gun regulations," quoting this very same
8 sentence from *Heller* as support.[60]  So *Bruen* does not contradict *Heller* on the issue of felon-gun
9 possession; rather it reinforces *Heller*'s conclusion that individuals with felony convictions fall
10 outside the scope of the Second Amendment's protections.[61]

11        Gamble then objects to the magistrate judge's conclusion that § 992(g)(1) passes the
12 second part of the *Bruen* test because there is a longstanding history and tradition of limiting gun
13 possession by felons, arguing that the first such restriction was only imposed in the 20th century,
14 so it is not a longstanding tradition.[62]  He also contends that the magistrate judge erroneously
15 relied on historical evidence of gun-restriction proposals that never became law.[63]

---

[57] ECF No. 35 at 4.

[58] ECF No. 38 at 4–5.

[59] *Heller*, 554 U.S. at 625–26.

[60] *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 636).

[61] The majority in *Bruen* concluded that its holding was "in keeping with *Heller*." *Bruen*, 142 S. Ct. at 2126.

[62] ECF No. 38 at 6; ECF No. 27 at 11.

[63] ECF No. 38 at 6–7.

9

While it is true that restrictions on felons' gun rights that most closely resemble § 992(g)(1) didn't emerge until the early 20th century,[64] it is not necessary that § 992(g)(1) have a historical twin, just that there is an analogous precursor.  And here, there is evidence of limitations on the gun rights of suspect or dangerous individuals that pre-dates our nation's founding.[65]  Although historical records from that period can be vague or sparse, a majority of courts have found a history and tradition of limiting the gun rights of individuals who stray from the law or legal norms.[66]  Because individuals with felony convictions fall into this category, § 992(g)(1) is consistent with that longstanding historical tradition.

In sum, I find that *Vongxay* remains controlling law and binds me to conclude that § 992(g)(1) and Gamble's prosecution under that statute are constitutional.  But even if *Bruen* abrogated that Ninth Circuit authority, Gamble's challenge fails because § 992(g)(1) passes both

---

[64] The Federal Firearms Act of 1938 restricted those convicted of a crime from possessing firearms.  It was amended in 1961 to specifically restrict the gun rights of individuals with felony convictions.  *See* Pub. L. No. 87–342, 75 Stat. 757 (repealed) (The "Act is amended by deleting the words 'crime of violence' . . . and inserting . . . 'crime punishable by imprisonment for a term exceeding one year.'").

[65] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, Law & Contemp. Probs. 55, 72 (2017) (recounting that 1637 Massachusetts Colony law required named individuals who "seduced & led [others] into dangerous errors" to turn in their weapons and firearms, and a Pennsylvania law enacted in the 1770's forbid individuals from possessing guns if they "refused to swear loyalty to the new American government"); Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 578 (1998) (noting that firearm restrictions were often predicated on racist ideologies that viewed people of color as suspect, like colonial-Virgina's prohibition on indigenous-firearm ownership).

[66] *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (finding under a *Bruen* analysis that § 922(g)(1) is consistent with this nation's historical tradition of firearm regulation); *United States v. Charles*, 633 F. Supp. 3d 874 (W.D. Tex. 2022); *United States v. Ingram*, 623 F. Supp. 3d 660 (D.S.C. 2022); *United States v. Young*, 639 F. Supp. 3d 515 (W.D. Pa. 2022); *United States v. Butts*, 637 F. Supp. 3d 1134 (D. Mont. 2022); *contra Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 104 (3d Cir. 2023) (holding that § 992(g)(1) was unconstitutional as narrowly applied to a defendant convicted of a misdemeanor punishable by up to five years in prison).

1   prongs of *Bruen*'s test.  So I overrule Gamble's objections, adopt the magistrate judge's

2   recommendation, and deny Gamble's motion to dismiss his indictment based on an alleged

3   Second Amendment violation.

4

**B.      Gamble's spoliation argument does not merit dismissal because the exculpatory**
5         **value of DNA evidence on the rifle was not apparent.**

6          Gamble brings a second motion to dismiss in which he argues that the portion of his

7   firearm charge related to the rifle should be dismissed based on spoliation of evidence.[67]

8   Gamble theorizes that Metro knew that there was potential exculpatory DNA evidence on the

9   black bag and rifle because it only sent the pistol and its magazine for testing, even though police

10  found the rifle and handgun at the same time and in the same place.[68]  He argues that there is no

11  comparable evidence because Metro sent the rifle out to a testing facility in Maryland to

12  determine whether it could be classified as a firearm, so the rifle can no longer be submitted for

13  DNA testing in accordance with Metro's protocol.[69]  The magistrate judge recommends that I

14  reject Gamble's spoliation argument, reasoning that Metro had no affirmative duty to conduct

15  DNA testing because the facts do not support the finding that the rifle and black bag contained

16  exculpatory evidence.[70]  Gamble objects that the government knew the exculpatory value of the

17  DNA evidence on the rifle because an officer applying for a warrant to retrieve Gamble's DNA

18

19

---

20  [67] ECF No. 28.

21  [68] ECF No. 39 at 3–4.

22  [69] *Id*. at 4; *see also* ECF No. 28 at 4, 7.  The government contends that the rifle was missing its dust cover—a piece of the rifle that protects the inside mechanisms from debris—and missing this component could raise issues of whether the rifle is considered a firearm within the meaning
23  of 18 U.S.C. § 921(a)(3).

[70] ECF No. 35 at 6.

11

hoped to compare it against "any and *all* firearms," and this admission establishes Metro's bad faith.[71]

### 1.  *A spoliation dismissal requires knowledge of the exculpatory value of lost evidence.*

The due-process clause requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense."[72]  "The government violates a defendant's due process rights when it destroys potentially exculpatory evidence in bad faith."[73] The "presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed."[74]  And "[b]ad faith requires more than mere negligence or recklessness."[75]  When deciding whether to dismiss a defendant's indictment based on lost or destroyed evidence, the court must view the evidence in the light most favorable to the government.[76]

### 2.  *The exculpatory value of rifle DNA is not apparent.*

That a DNA test on the rifle would have been exculpatory for Gamble was—and remains—not apparent.  Evidence is exculpatory when it tends "to establish a criminal defendant's innocence,"[77] and "[f]or evidence to be materially exculpatory, its exculpatory

---

[71] ECF No. 39 at 3 (original emphasis).

[72] *California v. Trombetta*, 467 U.S. 479, 488 (1984).

[73] *United States v. Ubaldo*, 859 F.3d 690, 703 (9th Cir. 2017).

[74] *Id*. (quoting *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir.1993)).

[75] *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

[76] *Ubaldo*, 859 F.3d at 703.

[77] Black's Law Dictionary (11th ed. 2019).

nature must be apparent."[78]  But the exculpatory value of evidence "is not 'apparent' when the evidence merely 'could have' exculpated the defendant."[79]  And here, DNA evidence from the rifle merely could have exculpated Gamble.

There are four likely outcomes of a DNA swab of a firearm: (1) the defendant's DNA is found on the gun; (2) only someone else's DNA is found; (3) no DNA is found; or (4) there's a mix of DNA, and just who it belongs to can't be determined.  Because any one of these results could be expected from a DNA test of the rifle, at best, Gamble could get lucky with scenario 2 or 3.  But even that would merely mean that Gamble didn't leave DNA on the rifle, not that he never possessed it.  So, at best, that favorable result only "could have" exculpated Gamble.  Also possible is scenario 1, which would have further incriminated him.  Similar considerations caused the Ninth Circuit to find in *U.S. v. Drake* that a lost digital-surveillance video did not violate a robbery defendant's due-process rights because "it [wa]s possible that [the video] would have further incriminated" the defendant.[80]

DNA testing of the black bag in which the rifle was found portends the more likely result. It found a mixture of DNA from five individuals, at least two of whom were male.[81]  Since the profiles were so mixed, "no additional conclusions [could] be made."[82]  Because the exculpatory value of any DNA testing of the rifle is not apparent, the government did not act in bad faith when it sent the rifle to Maryland for other testing, thus foreclosing Gamble's chance to have the

---

[78] *Sivilla*, 714 F.3d at 1172.

[79] *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) (quoting *Youngblood*, 488 U.S. at 56).

[80] *Id*. at 1090.

[81] ECF No. 31 at 11; ECF No. 48-1.

[82] ECF No. 48-1.

1  rifle DNA tested.  So I overrule Gamble's objection and deny his motion to dismiss based on

2  spoliation.

3  **C.      An adverse jury instruction is not warranted.**

4          Gamble alternatively moves for an adverse-inference instruction at trial, arguing that

5  whether his DNA was on the rifle goes to an essential issue of the case.[83]  The magistrate judge

6  recommends that I deny that request, too, because the factors required for a remedial jury

7  instruction balance in favor of the government.[84]  Gamble objects that the factors balance in his

8  favor because there is no substitute for DNA evidence on the rifle.[85]

9          A court must weigh "the quality of the Government's conduct against the degree of

10  prejudice to the accused" to determine whether to provide a remedial jury instruction.[86]  When

11  evaluating the government's conduct, a court must ask if (1) the evidence was lost or destroyed

12  while in the government's custody, (2) the government disregarded the defendant's interests, (3)

13  the government was negligent in failing to adhere to established and reasonable standards of care

14  for police and prosecutorial functions, (4) the acts were deliberate, whether they were taken in

15  good faith or with reasonable justification, and (5) the government attorneys prosecuting the case

16  participated in the loss or destruction of the evidence.[87]  When evaluating prejudice to the

17  defendant, a court must consider (1) the centrality and importance of the evidence in establishing

18  motive, intent, or elements of the crime; (2) the reliability of any secondary evidence; (3) the

19

20

---

[83] ECF No. 39 at 4.

[84] ECF No. 35 at 8.

[85] ECF No. 39 at 4.

[86] *Sivilla*, 714 F.3d at 1173 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979)).

[87] *Id*.

1  defendant's loss of any factual inferences; and (4) the effect on the jury from the absence of

2  evidence, including speculation and bias.[88]  In the end, "the government bears the burden of

3  justifying its conduct."[89]

4         An adverse jury instruction is not warranted here because the quality of the government's

5  conduct outweighs any prejudice to Gamble.  Gamble argues that the government disregarded his

6  interests when it sent the rifle for testing before his counsel had the opportunity to view it.[90]  The

7  government responds that the parties arranged a viewing after the rifle returned from Maryland,

8  but Gamble's counsel was a no-show.[91]  Although the rifle was in the government's control

9  when it was sent to Maryland for testing—precluding any further opportunity for DNA testing in

10 accordance with Metro's policy—the prejudice to Gamble is limited.  The absence of DNA

11 evidence does not establish an element of a crime in the same way that the presence of DNA

12 might.[92]  And as exemplified by the DNA results from the bag, the factual inferences that may be

13 gained from unidentifiable DNA on the rifle are not apparent.  So I adopt the magistrate judge's

14 recommendation and deny Gamble's request for a remedial jury instruction.

15 . . .

16

17

18

19

20

---

21 [88] *Id*. at 1173–74.

   [89] *Id*. at 1173.

22 [90] ECF No. 44 at 3.

23 [91] ECF No. 49 at 4–5.

   [92] *See supra* at p. 13.

**Conclusion**

IT IS THEREFORE ORDERED that Gamble's objections **[ECF Nos. 38, 39] are OVERRULED**, the magistrate judge's recommendations **[ECF Nos. 34, 35] are ADOPTED**, and Gamble's motions to dismiss **[ECF Nos. 27, 28] are DENIED**.

_____
U.S. District Judge Jennifer A. Dorsey
October 4, 2023